# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

**JOHN GOODING**                                                                                       **PLAINTIFF**

**VERSUS**                                                 **CIVIL ACTION NO. 1:15cv20-LG-RHW**

**CAROLYN COLVIN,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY**                                                        **DEFENDANT**

## REPORT AND RECOMMENDATION

Through Counsel, Plaintiff John Gooding filed this action January 20, 2015, seeking judicial review under 42 U.S.C. § 405(g) of the denial of Gooding's claim for Social Security disability insurance benefits.[1] Gooding asserts the Social Security Commissioner's decision should be reversed based on allegations that Administrative Law Judge (ALJ) William Wallis erred in failing to address Plaintiff's claimed disability under 20 CFR Part 404, Subpart P, App.1 (Part A), Listing 11.14; in rejecting the findings/opinions of treating physicians; in rejecting a finding of disability under 20 CFR Part 404, Subpart P, App.1 (Part A), Listing 11.02; and in failing to order additional testing to fully and fairly develop the record.

### Facts and Procedural History

On February 7, 2012, Gooding filed an application for disability insurance benefits alleging he had been disabled since December 31, 2009, when he was 46 years old.[2] [12, p. 193] Gooding alleged disability due to a seizure disorder, lung disease and respiratory problems, kidney stones, and tumors on his tongue. [12, p. 197] The application was denied initially on May 8, 2012, and on reconsideration on July 12, 2012. [12, pp. 69-70]

---

[1] Gooding has been represented by counsel since at least October 3, 2012. [12, pp. 106, 108-9]

[2] Gooding amended his application at the hearing to change the date of onset of disability to November 22, 2010, though he stopped working around the middle of June 2010. [12, pp. 39-42]

ALJ Wallis conducted a hearing on Gooding's claim on October 9, 2013, hearing testimony from Gooding and his wife Mary, and from Vocational Expert Ronald K. Smith. [12, pp. 33-68] Gooding testified he was born in August 1963, and that his education included almost two years of college. After 1994 when Gooding worked for Biloxi Belle Casino, he worked as a self-employed carpenter until 2009. [12, pp. 174-175] He testified a doctor told him to apply for Social Security disability in November 2010. He tried full-time work after that for three months, most recently near the end of 2012, but testified his seizures got worse and he could not perform properly. [12, p. 42] According to Gooding, his physical conditions include lung/respiratory problems (emphysema), grand mal seizures, kidney stones and a tongue tumor, and he also has ringing in his ears, constant headaches and multiple chemical sensitivity. He claims physical stress makes him get sick and leads to seizures, and he has a hard time sitting up, being vertical and lying flat. [12, pp. 43-44]

Gooding testified he began having seizures in February 2011. He claims that before September 2011 (when he was last insured), he could walk only five to ten minutes before becoming short of breath; that raising his hands over his head caused lung pain; he could stand only ten minutes before having to rest for ten minutes; his bones hurt when he rode in a car on bumpy roads; he got short of breath carrying anything; and dust, smoke and humidity exacerbate his breathing problems. He also thinks his memory is getting worse. [12, pp. 47-50] Gooding requires no help showering or dressing himself. He testified he could put clothes in the washer but "wouldn't fold them"; he does not vacuum, dust or mop unless it bothers him and no one else is there to take care of it. He does not go shopping and avoids public places because it would be embarrassing if he had a seizure. He testified his typical day consists of sitting in his recliner with his feet up, watching television. He also sleeps in the recliner. [12, pp. 50-53] Gooding

testified he can sit upright about 20 minutes before it bothers him, that his hands tremble when he is stressed or tired, moving around increases numbness in his hands and feet and he gets chest pain if he walks around. [12, pp. 54-55]

Gooding testified he had bad seizures in September 2011 almost daily and sometimes several in a day, and that it took hours, and sometimes days, before he could get up and around after a seizure. He also had daily trance-like seizures, triggered by light, pain, stress, fatigue, *etc*., during which he could hear, but not respond. He testified he might come out of these quickly, but sometimes it took hours or all day to return to normal. [12, pp. 56-57]

Mary Ellen Gooding has been married to Plaintiff for over 25 years. She could not say when Gooding first started having seizures because he did not tell her he was sick. She testified she first noticed them around March 2011, when her husband would be talking to her and just freeze mid-sentence for five to ten minutes before continuing. At other times he would start stuttering and shaking and couldn't communicate. Mrs. Gooding testified she was sometimes unsure whether Gooding was taking a nap or having a seizure. On other occasions, she would come home from work and find him bruised and/or bleeding from banging around on furniture and falling, or not breathing and turning blue. She stated she has seen grand mal seizures lasting over four hours with the body shaking and bouncing around. Twice she called an ambulance, in August 2011 and January 2013, but Gooding got very angry at her for doing so. Mrs. Gooding stated that in the spring and summer of 2011, Gooding had seizures all day all the time; she "never knew what happened," but would find him passed out. [12, pp. 58-60]

Vocational Expert Ronald Smith reviewed Gooding's work history as a carpenter, which, Smith testified, involves a medium level of physical demand and has a skill level of 7, but none of the skills from that work transfer to either light or sedentary positions. ALJ Wallis posed three hypotheticals to Smith, all of which assumed a person of Gooding's age, education

language and work background.  The first hypothetical assumed no exertional limitations, with ability to occasionally climb ramps or stairs, but never ladders, ropes or scaffolds; occasional balancing, frequent stooping, kneeling, crouching and crawling; and no exposure to unprotected heights, moving machinery or jobs requiring commercial driving.  This hypothetical further assumed a person who retained the mental residual functional capacity to understand, remember and carry out simple two- to three-step tasks and instructions, to sustain concentration, attention and persistence for two-hour periods; who could interact occasionally with supervisors and coworkers, but never with the public, and who would need direct, but non-confrontational supervision.  Considering all those factors, Smith testified the person could not perform Gooding's past work, but that there was other work available within the stated limitations, *e.g.*, cafeteria attendant which is light, unskilled work, and kitchen helper and hand packager, which are both medium unskilled work.  Smith testified significant numbers of all these jobs are available in the national economy.  [12, pp. 61-63]

     The ALJ's second hypothetical retained all the limitations of the first, and added exertional limitations that the person could lift, carry, push or pull 20 pounds occasionally, ten pounds frequently, could stand/walk six hours in an eight hour work day, and could sit a like period.  Considering these added limitations, Smith testified there was work the person could do, *e.g.*, the previously mentioned cafeteria attendant job, as well as mail clerk or assembly work such as a bench assembler, both of which are light, unskilled jobs existing in significant numbers in the national economy.  The third hypothetical added limitations that the person would be off task at least 15 percent of the workday and would miss work a minimum of two days per month.  Smith testified no other work would be available to one with those added limitations. [12, pp. 64-65]

On October 25, 2013, ALJ Wallis issued his 11-page decision finding Gooding has not been under a disability as defined in the Social Security Act from November 22, 2010 through September 30, 2011, the date he was last insured. [12, pp. 15-25] The Appeals Council denied review November 20, 2014 [12, pp. 6-9], and Gooding filed the action now before the Court.

## Standard of Review

Judicial review of a final decision of the Commissioner of Social Security is limited to determining whether substantial record evidence supports the Commissioner's factual findings, and whether such findings are reached through the application of correct legal standards. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). The Court reviews the entire record to determine whether substantial evidence supports the Commissioner's decision. *Villa*, 895 F. 2d at 1022. Credibility of witnesses and conflicts in the evidence are issues for resolution by the Commissioner, not the Court. It is not the Court's prerogative to substitute its judgment for that of the Commissioner or to re-weigh the evidence. *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007); *Harris*, 209 F.3d at 417 (quoting *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995)); *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988)(a finding of "no substantial evidence" is appropriate only if no credible evidentiary choices or medical findings support the decision); *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). Factual findings supported by substantial record evidence are conclusive and must be upheld. *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). The Court may reverse a decision of the Commissioner if it is based upon faulty legal analysis, but should accept the

Commissioner's legal conclusions if they are within reasonable meanings of the statutory or regulatory language. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 841-44 (1984). Absent a finding that the decision is unsupported by substantial evidence or that the Commissioner applied an incorrect legal standard, the Court must affirm the Commissioner's decision [*Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)]; the Commissioner's decision is accorded great deference and "will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the ... decision or finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

## Analysis

The Social Security Act defines disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months..." 42 U.S.C.A. § 423(d)(1)(A). It was Gooding's burden to prove a disability which precluded him from engaging in substantial gainful work during the pendency of his application for benefits. *Masterson v. v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) ("suffering of some impairment does not establish disability; a claimant is disabled only if [he] is 'incapable of engaging in *any* substantial gainful activity'").

ALJ Wallis applied the correct law for determining disability – following the five-step sequential evaluation process set out at 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i-v). Step one requires determination of whether the claimant is engaging in substantial gainful activity, *i.e.*, work that involves significant physical or mental activities and is usually done for pay or profit. Judge Wallis found Gooding did not engage in such activity from November 22, 2010

through September 30, 2011 (his date last insured).  [12, p. 17]  Step two requires determination of whether the claimant has a medically determinable impairment or combination of impairments which meets the duration requirement and is severe, *i.e.*, which significantly limits his ability to perform basic work activities.  ALJ Wallis found Gooding has severe impairments of seizure disorder, lung disorder and an organic mental disorder, the combined effects of which have more that minimal impact on his ability to perform work-related functions.  Although Gooding complained of a tongue tumor and kidney stones, Judge Wallis found Gooding failed to establish these impairments were severe under the Act, as the record contains neither any formal diagnosis of the conditions, nor any evidence of any associated functional limitations.

 Step three requires determination of whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Unless the impairment/combination of impairments is of such severity and meets the duration requirement, the analysis continues to step four.  Judge Wallis found Gooding's severe physical impairments of seizure disorder and a lung disorder do not meet or medically equal the Listings of 11.02 and 11.03 (neurological disorders), and 3.00 (respiratory disorders), respectively.  As to the former, the ALJ noted Gooding's treatment records do not document specified seizure frequency despite compliance with treatment as required by the neurological listings.  Although Gooding testified he had daily seizures before September 30, 2011, his records show he stopped taking his prescribed medication in June 2011 due to nausea and sleepiness and he refused to consider other medications at that time;[3] his treating neurologist noted Gooding's reported "staring spells" did not sound like a seizure disorder; and a neurological motor examination in October 2011 was essentially normal.  The

---

[3]He also stopped taking Keppra which helped his headaches, but caused itchiness.

Coastal Family Health Center records dated May-June 2011 and Advanced Neurodiagnostic Center records dated November 2011-January 2012 cited by Judge Wallis amply support these findings.  [12, pp. 349-357, 368-378].  While Dr. Robichaux (an ENT) stated in a February 2012 letter[4] that Gooding had experienced neurological problems for 18 months[5] and had progressed to "full blown seizure disorder" as documented by a home video Gooding had made [12, p. 394, 396-397], in June 2012 treating neurologist Dr. Beaucoudray noted an absence of documented seizures, "only reported seizure like episodes after BP fume (oil) exposure."[6]  [12, p. 390]

Listings from respiratory disorders must be established by sufficiently detailed medical evidence "to permit an independent reviewer to evaluate the severity of the impairment."  20 CFR Part 404, Subpart P, Appendix 1, § 3.00A.  Judge Wallis found Gooding has a lung disorder and history of past surgery, but that he did not meet the listings due to the lack of record evidence showing "specific respiratory impairments with associated symptomology or testing results," and the absence of any medical expert opinion indicating Gooding meets the listings criteria.  The record demonstrates the ALJ fairly considered and evaluated the evidence of Gooding's respiratory complaints/treatment after the oil spill including his August 2010 emergency room visits at Garden Park Hospital (breath sounds clear and equal; respiratory effort easy, regular, normal, unlabored); February 2011 examination with Dr. Morgan (x-ray showing mild chronic lung disease, but no acute infiltrate or effusion and examination revealing lungs clear to auscultation); April 2011 pulmonary function test (FVC and FEV1[7] measurements over

---

[4]Dr. Robichaux stated he treated Gooding *pro bono*, so he had "scant records."  [12, p. 396]

[5]Six months longer than Gooding asserted since he stated his seizure problems began in February 2011.

[6]The BP Deep Water Horizon oil spill occurred in the Gulf of Mexico in April 2010.

[7]Forced vital capacity, the total amount of air exhaled during FEV (forced expiratory volume) test.  FEV1 is the amount of air exhaled measured during the first second of the forced breath.

90% of that predicted); May 2011 treatment note again showing his lungs were clear with normal breath sounds; and October 2011 observation of "no acute distress."  [12, pp. 330-336, 319-323, 338, 357, 374-375]

Judge Wallis found Gooding had a severe impairment of organic mental disorder, citing medical records of May 2011 diagnosing memory loss (although examination noted difficulty in evaluating Gooding's judgment, insight and mood, and found him properly oriented to time, place and person, with recent and remote memory intact); October 2011 treatment notes diagnosing cognitive dysfunction ("slowed cognitive processing," but noting appropriate mood and affect, adequate immediate and remote recall, and ability to recall the majority of his past medical history), and November 2011 complaints of memory loss though he was found to be in no acute distress and able to answer all questions appropriately, albeit often slowly.  [12, pp. 354-355, 375-376, 377]  The ALJ found Gooding's mental impairment did not meet or medically equal the criteria Listing 12.02, as the record evidence showed Gooding had only mild restriction in activities of daily living, moderate difficulties in social functioning and areas of concentration, persistence or pace, and no episodes of decompensation of extended duration.  The record evidence supports these findings.

At the fourth step of the evaluation, the ALJ must determine (1) the claimant's residual functional capacity, *i.e.*, his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments, and (2) whether he has the residual functional capacity to perform the requirements of his past relevant work.  If claimant can perform the requirements of his past relevant work, he is not disabled; if he cannot, the inquiry proceeds to the fifth and final step of the evaluation where the Commission must determine from the residual functional capacity, the claimant's age, education and work experience whether he can make an adjustment to other work.  If he can do other work, he is not disabled.  To support a finding that a claimant

is not disabled at this step, the Commission must provide evidence demonstrating that other work which the claimant can do exists in significant numbers in the national economy.

ALJ Wallis found Gooding unable to perform his past relevant work as a carpenter. [12, p. 22]  However, based upon the entire record, the ALJ found that Gooding has the residual functional capacity to lift, carry, push or pull 20 pounds occasionally, ten pounds frequently; to stand or walk six hours in an eight hour workday, and sit a like period in a workday; occasionally climb ramps and stairs but never ladders, ropes or scaffolds; occasionally balance; frequently stoop, kneel, crouch and crawl; never work at unprotected heights or near moving machinery or where driving is required.  The ALJ also found Gooding has the mental residual functional capacity to understand, remember and carry out simple two- to three-step tasks and instructions; to attend, concentrate and persist for two hour periods, occasionally interact with supervisors and coworkers but never with the general public; and that he required direct, non-confrontational supervision.  The State agency consultants' determinations upon which the ALJ relied support these findings.  [12, pp. 379-386, 401-412, 413-415, 443-446]  While the Judge found Gooding's medically determinable impairments could reasonably be expected to cause some of the symptoms he alleged, he further found the statements of Gooding and his wife regarding the intensity, persistence and limiting effects of the symptoms not entirely credible due to inconsistencies, conflicts with other evidence, and/or lack of evidentiary support.  Judge Wallis articulated his reasons for the weight given particular evidence, *e.g.*, significant weight to State agency consultants Thomas Tapley, M.D., Louis Saddler, M.D., and Ruth Ann Lyman, Ph.D., whose findings on functional limitations were generally consistent with one another as well as with the evidence of Gooding's daily living activities, and with the record evidence as a whole, and indicated Gooding remained capable of performing light unskilled work. [12, pp. 358-365, 379-386, 401-412, 413-415]  The ALJ gave less weight to the opinions of Dr. Morgan

and Dr. Morris, and little weight to Dr. Robichaux's opinions.  Dr. Morgan's limitations were based on spinal concerns only infrequently mentioned in Gooding's treatment records; Gooding did not raise back concerns at the hearing; and the record contains no imaging of any significant spinal abnormalities from the relevant period.  [12, pp. 318-323]  Dr. Morris's opinion was offered almost two years after Gooding's date last insured and the record evidence does not indicate that the limitations he noted existed during the relevant time.  And Dr. Robichaux's "severely limiting opinions" were unsupported by objective findings or treatment notes, and conflicted with the opinions of Gooding's treating neurologist with respect to seizures.  Where a treating physician's opinion is conclusory, or without objective medical evidence supporting it, or otherwise unsupported by the record or inconsistent with the record as a whole, the ALJ is not required to give the opinion controlling weight.  20 C.F.R. § 404.1527(c).  Substantial evidence, including Vocational Expert Smith's testimony, supports the ALJ's findings, that considering Gooding's work history, age, education level, and residual functional capacity, Gooding remained capable of performing simple unskilled work, and that he could perform existing unskilled jobs at a light exertional level such as cafeteria attendant, mail clerk and bench assembler.

Gooding argues the Commission erred in four particulars: (1) failing to address Neurological Listing 11.14; (2) failing to give proper weight to the opinions of consulting examiner Dr. Morgan and treating physician Dr. Robichaux; (3) failing to provide valid basis for rejecting a finding of disability under Neurological Listing 11.02; and (4) failing to order audiometry and caloric or other vestibular testing to develop the record.  [13]  It was Gooding's burden to prove his impairment(s) met not just some, but *all* the specified medical criteria of the listings he claims he matched.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  The record evidence regarding Listing 11.14 consists of checklist forms on which Dr. Robichaux and Dr.

Morris have checked "yes" as to significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.[8] Other than his checklist [12, pp. 433-435], Robichaux's opinions appear in letters dated May 2011, February, July and August 2012, and July 2013; there are no Robichaux treatment records. [12, pp. 393-400, 429-432] An ALJ may disregard a treating physician's "brief and conclusory" statements unsupported by "medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Foster v. Astrue*, 410 F. Appx. 831, 833 (5th Cir. 2011), citing *Perez v. Barnhart*, 415 F.3d 457, 465-66 (5th Cir. 2005). And as previously noted, Dr. Morris's opinion was offered almost two years after Gooding's date last insured and record evidence does not indicate his noted limitations existed during the relevant time. In addition, Robichaux's and Morris's opinions conflict with other medical evidence, *e.g.*, Plaintiff's treating neurologist Dr. Beaucoudray who found Gooding's motor strength and sensory examination intact and gait normal in May 2012, and consultative examiner Dr. Morgan who noted in February 2011 that Gooding's coordination, station and gait were unremarkable, that he could walk and sit normally and was not restricted in handling, fingering or feeling. [12, pp. 368, 426, 321, 323] The undersigned finds no merit to the alleged error regarding Neurological Listing 11.14.

      Gooding next charges that the Commission failed to give proper weight to the opinions of consulting examiner Dr. Morgan and treating physician Dr. Robichaux. The ALJ found Dr. Morgan's limitations [12, pp. 318-323] was based on spinal concerns only infrequently

---

[8]20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1104B requires "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).*" Section 11.00*C requires "Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms."

mentioned in treatment records; that Gooding raised no back concerns at the hearing, and the record contains no imaging of significant spinal abnormalities from the relevant period. The record supports these findings. It is for the ALJ to determine credibility of both lay and expert witnesses, and weigh their opinions accordingly. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). Judge Wallis was not required to accept Dr. Robichaux's opinion merely because he was a treating physician, nor was he obliged to consider limitations unsupported by the record – particularly in the complete absence of any treatment records of the opining doctor. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). The ALJ may disregard brief, conclusory statements which are unsupported by medically acceptable clinical laboratory diagnostic techniques or other evidence. *Greenspan*, 38 F.3d at 237. The undersigned finds no error with respect to the ALJ's treatment of the opinions of Doctors Morgan and Robichaux.

Again relying on the checklist forms from Doctors Robichaux and Morris, Gooding contends the ALJ failed to provide a valid basis for rejecting a finding of disability under Listing 11.02, which deals with convulsive epilepsy, and requires that the condition be "documented by detailed description of a typical seizure pattern including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The ALJ specifically considered 11.02 with respect to Gooding's seizure disorder and found he did not meet the listing. The ALJ's decision to give little weight to these checklists has been previously discussed, and found to be supported by record evidence, and proper under the law. Isolated, conclusory statements are entitled to little weight. *See Leggett*, 67 F.3d at 566 (5th Cir. 1995). Gooding's treating neurologist noted no documented seizures; Gooding's complaints about seizures were inconsistent; and he admittedly discontinued his seizure medication on his own and refused to consider other medications for a time. "Under 11.02 ..., the criteria can be applied only if the impairment persists *despite the fact that the individual is following prescribed antiepileptic treatment*." 20 C.F.R. § Pt. 404, Subpt.

P, App. 1. (emphasis added). The undersigned finds the record supports the ALJ's conclusion that Gooding failed to prove his seizure problem met Listing 11.02.

Gooding's last asserted error is that the ALJ failed to fully develop the record by ordering audiometry and caloric or other vestibular testing to determine whether he had a hearing impairment meeting or equivalent to Listing 2.07.[9] To show an impairment meets or is equivalent to the listing, Gooding was required to meet *all* the specified criteria, providing medical findings that support each of the criteria. *Zebley*, 493 U.S. at 530 n. 8. His argument on this point again relies on the July 2013 checklist prepared by Dr. Robichaux, which has checked, among other things, that Gooding has frequent attacks of balance disturbance, tinnitus, progressive loss of hearing and disturbed function of the vestibular labyrinth, *not* established by audiometry or caloric or other vestibular testing. [12, p. 439] Although Dr. Robichaux had been seeing Gooding since early 2011, he did not mention a hearing problem until this July 23, 2013 checklist and letter, and he provided no treatment notes. Robichaux's 2013 unsupported opinion does not establish a hearing disability which existed prior to September 30, 2011 when Gooding was last insured. Whether to order a consultative examination is discretionary with the ALJ. While an administrative law judge has a duty to fully and fairly develop the facts relative to a claim for disability benefits, the Court will not reverse an ALJ's decision for failure to fully and fairly develop the record absent a showing by the claimant that he was prejudiced thereby, *i.e.*, that he "could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000), citing *Brock v. Chater,* 84 F.3d 726, 728 (5th Cir.1996); *Kane v. Heckler,* 731 F.2d 1216, 1220 (5th Cir.1984). Gooding has presented nothing to show that hearing tests in 2013 would have demonstrated a hearing loss within the relevant period. Substantial record medical evidence indicates Gooding's hearing was normal during the

---

[9]The listing deals with "disturbance of labyrinthine-vestibular function ..., characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With ... disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and ... hearing loss established by audiometry."

relevant period. [12, pp. 349, 354, 357] And residual functional capacity assessments in July 2011 and April 2012 noted no limitations due to hearing problems. [12, pp. 362, 383] The Court finds upon review of the record in its entirety, that Gooding has failed to demonstrate prejudicial error by the ALJ's not ordering additional testing regarding his claimed hearing impairment. The ALJ is not obligated to investigate possible disabilities not alleged by the claimant or those not clearly indicated on the record. *Leggett*, 67 F.3d at 566.

The record demonstrates the ALJ carefully reviewed and considered all the evidence of Plaintiff's claimed impairments. Following the prescribed analysis, he identified the evidence upon which he relied and adequately explained the weight he assigned to the evidence. The Court finds upon review of the record in its entirety, that Gooding has failed to demonstrate error by the ALJ's not ordering additional testing regarding his claimed hearing impairment

## RECOMMENDATION

Based upon consideration of the entire record of proceedings below and controlling law, the undersigned is of the opinion that the Commissioner's final decision is supported by substantial evidence and in accord with relevant legal standards. The undersigned therefore recommends that the decision of the Commissioner be affirmed.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Under Rule 72(a)(3), *Local Uniform Civil Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi*, after service of a copy of this Report and Recommendation, each party has fourteen days to serve and file with the Clerk any written objections to it. Within seven days of service of objections, the opposing party must either serve and file a response or notify the District Judge that he does not intend to respond to the objection. An objecting party must specifically identify the findings, conclusions, and recommendations to which he objects; the District Court need not consider frivolous, conclusive, or general objections. A party who fails to file written objections to the proposed

findings, conclusions, and recommendations within fourteen (14) days of being served a copy is barred, except upon grounds of plain error, from attacking on appeal any proposed factual finding or legal conclusion accepted by the District Court to which he did not object. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Signed, this the 26th day of January, 2016.

/s/ *Robert H. Walker*
ROBERT H. WALKER
UNITED STATES MAGISTRATE JUDGE